1
2
3
4
5
6

The Honorable John H. Chun

7
8
9

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10
11

UNITED STATES OF AMERICA,

Plaintiff,

No. CR22-69 JHC

12
13
14

v.

DWIGHT CHRISTIANSON HENLINE,

Defendant.

GOVERNMENT'S TRIAL BRIEF

15
16
17
18
19

The United States of America, by and through Tessa M. Gorman, Acting United States Attorney for the Western District of Washington, and Erin H. Becker and Cecelia Gregson, Assistant United States Attorneys for said District, respectfully submits this Trial Brief in the above-captioned case.

20

## I.      INTRODUCTION

21
22
23
24
25
26
27

Henline is charged by Superseding Indictment with four counts of Arson, in violation of 18 U.S.C. § 844(i). Dkt. 41. Specifically, he is charged with intentionally setting a fire at approximately 10:00 p.m. on April 6, 2022, in Friday Harbor, Washington. The fire smoldered through the night, eventually growing into a conflagration that engulfed and destroyed three buildings and damaged several others. The four buildings charged in the Superseding Indictment—which were the ones most

28

GOVERNMENT'S TRIAL BRIEF - 1
*United States v. Henline*, CR22-69 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

heavily damaged—are all adjacent to each other along Spring Street in the heart of Friday Harbor.

Defendant's trial is set to commence on October 30, 2023, at 1:30 p.m. The government expects to call approximately fifty witnesses and to introduce approximately 200 exhibits, depending upon potential stipulations and this Court's rulings. The government anticipates that it will be able to present its case-in-chief in about eight days. The government's exhibit list is being filed contemporaneously with this trial brief. The government's witness list is not being filed, but is being provided to the defendant and the Court today. See Local Criminal Rule 23.3(b).

## II.   FACTUAL BACKGROUND

### The Fire

On Thursday, April 7, 2022, at approximately 3:43 a.m., Eugene Wilson, a local tow truck driver, called the San Juan County Sheriff's Office (SJCSO) dispatch reporting a fire in downtown Friday Harbor. Firefighters responded quickly and found a large fire engulfing the rear of the building at 40 Spring Street, which housed the businesses Crystal Seas Kayaking, San Juan Excursions, and San Juan Property Management. The firefighters attempted to quell the flames, but they spread to the eaves of the adjacent building, 50 Spring Street (leased by Windermere Real Estate San Juan Island), and then to the next building at 70 Spring Street/80 First Street (leased by Crow's Nest Coffee Shoppe and Herb's Tavern LLC), before the fire was brought under control. Those three buildings were so badly damaged that they were torn down. The fire also damaged other buildings on the block, most notably a building on the other side of 40 Spring Street, One Front Street (leased by a number of different businesses, including the SkyBar). Each of those businesses was significantly impacted by the fire.

Because of the scale of the fire and damage, and the small fire department, ATF's National Response Team (NRT), comprising about two dozen certified fire investigators,

GOVERNMENT'S TRIAL BRIEF - 2
*United States v. Henline*, CR22-69 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

certified explosive specialists, electrical engineers, fire protection engineers, and other investigators, responded to the island. Over the next week, they processed the scene, interviewed victims and witnesses, and collected evidence to determine the origin and cause of the fire. Among the many items of evidence collected, investigators found a white BIC lighter on the sidewalk in front of 1 Front Street.

During that investigation, agents located and recovered video from a Nest Security System in the Windermere Real Estate Office. One of the cameras inside Windermere was set in a rear conference room, pointing towards the back of the building. The windows in that conference room were adjacent to and looked out at the rear wooden deck area of the Crystal Seas Kayaking building. While the shades to those windows were closed, the video captured a bright flash of light at approximately 10:04 p.m. on April 6, 2022. The flash of light lasted for approximately 34 seconds and then began to flicker and diminish in brightness. The audio also captured a crackling sound.

Several hours later, at approximately 3:15 a.m. on April 7, 2022, the Windermere Real Estate Office's Nest Security System began capturing a glow through the windows and the glass door of the conference room. At approximately 3:38 a.m., a glow consistent with fire and what appeared to be white smoke were observed outside the windows and the glass door. The video ended when the power to the building went out a few minutes later.

Based upon witness statements, fire patterns and fire dynamics, the Nest video from Windermere, and other evidence, Certified Fire Investigator Ryan McCormick determined that the fire originated on the lower rear wooden deck behind Crystal Seas Kayaking. He further determined that the cause of the fire was an ignitable liquid being introduced into the fire scene and ignited at about 10:04 p.m. He classified the fire as incendiary, meaning that it was intentionally caused.

///

GOVERNMENT'S TRIAL BRIEF - 3
*United States v. Henline*, CR22-69 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

2

<u>Identification of Henline in the Vicinity of the Fire When It Began</u>

During their investigation, ATF Special Agents and SJCSO personnel collected video recordings from numerous cameras in the vicinity of Crystal Seas Kayaking. None of the cameras were pointed at the front of Crystal Seas Kayaking or its back deck, other than the Windermere camera, for which the shades were closed. One of those video recordings showed a person walking away from the vicinity of Crystal Seas Kayaking at 10:05 p.m.—just one minute after the fire was ignited. Investigators pieced together other video to identify that person and trace his movements through Friday Harbor on the evening of April 6, 2022. Through that work, they were able to identify the person as the defendant, Dwight Henline, and establish a timeline of his activities. These included:

5:04 p.m.: Henline purchased candy and two Rockstar energy drinks at King's Market.

5:12 p.m.: Henline purchased bleach and ammonia at King's Market.

7:15 p.m. (approximately): SJCSO Deputy Holt served Henline with a trespass notice at Washington State Ferries Lot C.

7:50 p.m.: Henline walked to a large red building on the waterfront, which housed an ice cream shop and other businesses, and went behind and below the building to the lower deck; he appeared to be carrying a backpack and rolling a suitcase.

8:10 p.m.: Henline walked up the stairs from the deck area without the suitcase and traveled towards Cask and Schooner Public House, which is at One Front Street and adjacent to Crystal Seas Kayaking. Henline appeared to be carrying a backpack.

8:24 p.m. to 9:37 p.m.: Henline made several trips to and from the lower deck of the red building, walked around downtown, and bought something at Haley's, a sports bar and restaurant.

9:53 p.m.: Henline entered The Little Store, a local convenience store, and purchased Ronsonol lighter fuel.

GOVERNMENT'S TRIAL BRIEF - 4
*United States v. Henline*, CR22-69 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

9:55 p.m.: Henline took a circuitous route to Spring Street.

9:56 p.m.: Henline crossed Spring Street, passed King's Market (a grocery store about a block from and on the same side of Spring Street as Crystal Seas Kayaking), and continued to travel towards the area of Crystal Seas Kayaking.

10:04 p.m.: The fire ignited on the back deck of Crystal Seas Kayaking.

10:05 p.m.: Henline emerged from the block where all four victim buildings were located, nine minutes after he entered the block. He crossed the street, went behind and below the red building where he had stashed his suitcase, retrieved the suitcase, and walked towards the ferry terminal.

Henline remained in the area of the ferry terminal until he boarded the ferry at 10:24 p.m. The boat departed a few moments later.

Henline was identified from the ferry video by San Juan County law enforcement personnel. He was well known to a number of the deputies, as his previous conduct had generated several calls for service in Friday Harbor. In fact, as referenced above, Deputy Holt interacted with Henline at about 7:15 p.m. that evening when he issued him a trespass notice. Deputy Brandt saw Henline at King's Market in the cleaning products aisle, right before he purchased the bleach and ammonia. And Deputy Holt took a report from Henline's former girlfriend and her new boyfriend that Henline had harassed them earlier that afternoon.

Vehicle Search Warrant

On April 11, 2022, after identifying Henline as the probable suspect, investigators located Henline's 1999 Mercury Villager minivan parked in the Friday Harbor Washington State Ferries Commuter Parking Lot C. They towed the van and obtained a search warrant. Inside, agents recovered a King's Market receipt dated April 6, 2022, at 17:05:38, documenting a purchase of two energy drinks and M&Ms; multiple lighters,

GOVERNMENT'S TRIAL BRIEF - 5
*United States v. Henline*, CR22-69 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

including two white BIC lighters that looked like a white lighter that had been found near the scene of the fire; charcoal lighter fluid; and a gas can with gasoline.

Phone Interview of Henline

On April 13, 2022, the case agent, Greg Heller, and SJCSO Detective Lukas Peter were trying to locate Henline. They obtained his phone number and a search warrant to track his phone. They also called Henline, and ultimately spoke with him twice. The investigators recorded the calls.

Henline told them that he had left Friday Harbor and was "done with that place." He confirmed that he had had contact with a SJCSO deputy who had served him with a trespass notice. Henline told the investigators that he had left Friday Harbor before the fire started, initially saying he had been trying to take the 7:30 p.m. ferry, before admitting that that ferry left late. He said he had ordered a chicken wrap from Haley's around 9:00 p.m., picked it up, and walked down that side of the street (i.e., the side across the street from Crystal Seas Kayaking) towards the ferry terminal. He said that as he walked by, he saw some people outside of Herb's Tavern. He estimated this was about 9:30 p.m. Henline said he ate his food and had a cigarette near an ice cream shop where he could watch for the ferry to arrive. Henline said he did not walk behind any buildings or go anywhere else because he was trying to catch the ferry. He denied ever going behind any buildings. He denied buying lighter fluid.

Search of Henline's Grandparents' Residence; Arrest

The warrant for Henline's phone's location led investigators to the vicinity of Henline's grandparents' house. They obtained a search warrant to search that house, which they executed in the evening of April 15, 2022. The grandparents directed agents to a bedroom, where investigators located an 8-ounce yellow Ronsonol lighter fuel container, consistent with the one that Henline purchased from the Little Store right before the fire began, that was mostly empty; several BIC lighters; clothing consistent

GOVERNMENT'S TRIAL BRIEF - 6
*United States v. Henline*, CR22-69 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

with what was worn by Henline in the various surveillance videos collected during the investigation; a black suitcase also consistent with what was seen in the surveillance footage; several knives; a Rockstar energy drink can; and documents connecting Henline to the items. Agents seized a black cell phone that they determined was Henline's.

Following the execution of the residence search warrant, investigators obtained a state arrest warrant. A Langley Police Department officer ultimately located and arrested Henline in Langley on April 16, 2022, wearing some items of clothing that were also consistent with what Henline wore as he walked around Friday Harbor on April 6, 2022.

## Lighter Fuel

Investigators purchased Ronsonol lighter fuel from the Little Store for $4.87. They compared the Ronsonol lighter fuel container that they purchased to the Ronsonol lighter fuel container they recovered during the search warrant; the two containers appeared to be identical. In fact, they both had the same identification number on the bottom. Ronsonol has advised that the number represents the precise minute that the bottle came off the production line, and that only about 175 bottles come off per minute.

The Ronsonol lighter fuel bottle indicated that when new it contained 237 mL of product. Investigators measured the contents of the bottle recovered from Henline's room during the search warrant. Approximately 30 mL remained in it.

Ronsonol lighter fuel is commonly used to fill refillable lighters. It is marked as being "extremely flammable." During the executions of the search warrant of the residence and Henline's minivan, investigators located many BIC disposable lighters. No refillable lighters were recovered.

## Search of Abandoned Car

On June 14, 2022, a Friday Harbor resident directed SJCSO Deputy Peter[1] to an abandoned car in an empty parking lot a few blocks away from the fire scene. Inside, the

---

[1] Deputy Peter has since been elected the San Juan County Sheriff.

deputy noticed a blue bag containing a bottle of lamp oil, a bottle labeled ammonia, and other items that seemed like they could be connected to the fire. Outside the car was a Rockstar Energy drink can with holes punched in it. Inside the can was styrofoam and a liquid, probably the paraffin oil.

Deputy Peter searched the car pursuant to the registered owner's consent. Inside he found a blue bag containing a bottle of paraffin lamp oil, a container of ammonia, a container of bleach, and more pieces of styrofoam. The blue bag, ammonia, and bleach were consistent with what Henline had purchased at King's Market on the day of the fire. Agents later located a record from the local ACE Hardware store showing—and the clerk remembered—that Henline had bought the paraffin lamp oil that day as well.

<u>Motive</u>

Henline grew up and his family lived in Oak Harbor on Whidbey Island. However, in 2021 and 2022, he was living in Friday Harbor. In the weeks preceding the fire, Henline's life and mental state were deteriorating. Two former romantic partners— Aurora Covington and Sophie Marinkovich—wanted nothing more to do with him. He became distraught and angry whenever he heard their names. When he ran into Covington and her new boyfriend, Jamie Briggs, on March 27, 2022, he yelled at them, called them names, and repeatedly tapped the knives that he often carried on his person. Covington and Briggs were so alarmed that they called the police. Officers responded, took a report, and contacted Henline. He told the officers that he was having "one of those days," that he needed his medications changed to be more effective, and that he had "just [seen] [his] ex and lost [his] cool."

He also could not keep a job. He had been working for Made Pressure Washing, Window, Roof, and Gutter Cleaning doing odd jobs, but was fired because he was unreliable.

GOVERNMENT'S TRIAL BRIEF - 8
*United States v. Henline*, CR22-69 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Henline was on the outs with his roommate, Eric King, who had to move out as a result. Henline invited another person to live with him, but ultimately they could not pay the rent, so his landlord told him to vacate his residence. He did, but his vehicle was inoperable, so he left it behind. The landlord continually asked him to have it towed away.

Things came to a head on April 6, 2022. After calling his former boss, Ade Kurniadi, and asking for his job back, Kurniadi gave him another chance. Only a couple of hours into the work day, Kurniadi told Henline that if his work did not improve, he could not continue to employ him. Minutes later, Henline gave up, told Kurniadi he wanted to go home, and quit. Kurniadi gave him a ride from the worksite into the town of Friday Harbor and dropped him off hear ACE Hardware.

While in Friday Harbor, Henline went to King's Market and bought the bleach and ammonia, as discussed above. He then headed a few blocks down the street towards the lot where the abandoned car, bleach, ammonia, paraffin oil, styrofoam, and Rockstar energy can were later found. At some point, he opened the ammonia and bleach, but eventually abandoned them there.

As he left the lot at about 5:44 p.m., he encountered Covington and Briggs again. According to Briggs, Henline yelled at them, saying he would "come after them," that they wouldn't see it coming, and that they wouldn't know what happened. Covington confirmed that Henline was threatening them, calling them "pieces of shit," telling them that they "deserved to die," and saying that he would come after them when they least expected it. Covington and Briggs again reported the incident, providing written statements.

Henline then proceeded to ACE Hardware, where he purchased the Ultra-Pure Paraffin Lamp Oil at 5:54 p.m. He then returned to the abandoned car and empty lot, where he opened the lamp oil, poured some into an empty Rockstar Energy drink can,

GOVERNMENT'S TRIAL BRIEF - 9
*United States v. Henline*, CR22-69 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

and added several pieces of polystyrene and related substances, more commonly known as Styrofoam. Budding chemists are aware that Styrofoam can be dissolved in gasoline or a similar fuel to make a sticky, gelatinous, and flammable substance—essentially napalm. However, the Styrofoam did not dissolve in the paraffin lamp oil. Henline abandoned the can and lamp oil next to the abandoned car.

About a half hour later, Henline had contact with an employee of a Friday Harbor church that hosted AA meetings Henline attended. The employee eventually called the police and asked them to trespass Henline from the church. SJCSO Deputy Holt responded, took the complaint, and looked for Henline. Meanwhile, Henline arranged to have the last of his possessions still at his rental home—the inoperable van—towed from that rental to Ferry Lot C. His AA sponsor, Brian Germain, helped him move it. Deputy Holt located Henline at Ferry Lot C as he and Germain arrived with his van. The officer gave Henline the trespass notice. Henline acknowledged receipt, then told Deputy Holt that he was leaving the island the next day and returning to Oak Harbor, where he would live with family. Henline also said that he had left a suitcase at the church. Germain offered to retrieve it.

Over the next few hours, Henline wandered around town as described above. Around 8:30 or 9:00 p.m., Marinkovich drove into the area, parked her car across the street from where the fire later began, and went into Herb's Tavern (one of the businesses later destroyed by the fire) to play pool with a friend. Henline was familiar with her car, as he had previously ridden in it. When Marinkovich left around 10:00 p.m., she discovered that one of the tires on her car was completely flat; it was undriveable. She reparked her car, this time on the other side of the street, closer to where the fire started, and got a ride home. The tire was later collected by investigators, who discovered a slash in it. Rick Wyant, a toolmark examiner, later examined the tire. He determined that it had

GOVERNMENT'S TRIAL BRIEF - 10
*United States v. Henline*, CR22-69 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

a slash-type defect caused by a single-edged blade approximately 1.25" in width. One of the knives recovered from Henline's room is that type of knife.

### III.    ELEMENTS OF THE OFFENSE

The defendant is charged with four counts of *Arson* in violation of Title 18, United States Code, Section 844(i). That statute provides for criminal penalties for one who "maliciously damages or destroys, or attempts to damage or destroy, by means of fire . . . any building . . . used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." Although there is no Ninth Circuit model instruction for violations of Section 844(i),[2] the elements are self-evident. For the defendant to be found guilty, "the government must prove that the defendant: (1) maliciously; (2) damaged or destroyed a building . . . ; (3) by means of fire . . . ; and (4) the building . . . was used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." *Togonon v. Garland*, 23 F.4th 876, 877–78 (9th Cir. 2022). Here, the defendant is also charged with attempting to commit arson. Dkt. 41.

The term "maliciously" in this context has its common law meaning. *Togonon*, 23 F.4th at 878. A defendants acts "maliciously" if "he either intentionally damages or destroys property covered by § 844(i) or acts 'with willful disregard of the likelihood that damage or injury would result from his or her acts.'" *Id.*

With respect to the jurisdictional element, the Supreme Court has held that the expansive language of the statute, reaching "*any* building" used in "*any* activity" affecting interstate or foreign commerce "expresse[d] an intent by Congress to exercise its full power under the Commerce Clause." *Russell v. United States*, 471 U.S. 858, 859–62 (1985). As such, the statute has been held to reach a building that houses a business that "purchases, sells, or uses goods that originated or came from out of state." *United*

---

[2] There is a model instruction for *Arson*, but it involves a violation of 18 U.S.C. § 81. *See* Ninth Circuit Manual of Model Criminal Jury Instructions §24.2 (2023).

GOVERNMENT'S TRIAL BRIEF - 11
*United States v. Henline*, CR22-69 JHC

*States v. Gomez*, 87 F.3d 1093, 1097 (9th Cir. 1996). It covers a business that "served customers from outside the [s]tate." *United States v. Menzer*, 29 F.3d 1223, 1230 (7th Cir. 1994); *see also United States v. Mahon*, 804 F.3d 946, 952 (9th Cir. 2015) (citing cases involving businesses that attracted out-of-state tourists). And, the rental of real estate *per se* affects interstate or foreign commerce. *Russell*, 471 U.S. at 862; *Gomez*, 87 F.3d at 1096. *See also Mahon*, 804 F.3d 946, 952–53 (holding that a government's "Office of Diversity and Dialogue" affected interstate or foreign commerce where it "[p]artner[ed] with numerous corporate sponsors and local hotels, it planned, hosted, and supported events that drew thousands of people to [the city,] . . . worked with a national bureau to arrange for speakers (who were paid thousands of dollars) to come to the city, . . . took applications and payments from vendors to participate in these events . . . [a]nd it employed several forms of media and a dedicated phone line to publicize its events").

## IV.   POTENTIAL LEGAL AND EVIDENTIARY ISSUES

### A.   Statements of the Defendant

The government expects to introduce evidence regarding statements made by the defendant, including the recorded statements he made to Agent Heller and Detective Peter, and the spontaneous statements he made to Langley Police Officer Hathaway, ATF Special Agent Salcepuedes, and Washington State Patrol Detective Early during his arrest and subsequent transport. A defendant's own statements are admissible, non-hearsay admissions of a party-opponent when offered into evidence by the United States. *See* Fed. R. Evid. 801(d)(2)(A).

The government may offer all, some, or none of a defendant's statements at trial under Rule 801(d)(2). A defendant, however, cannot use this rule to offer his own prior out-of-court statements. Rule 801(d)(2) is unavailable to the defendant in this case, since he would be the proponent of the evidence and, where he seeks to introduce it, it is not offered against him. *United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000); *United*

GOVERNMENT'S TRIAL BRIEF - 12
*United States v. Henline*, CR22-69 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

*States v. Fernandez*, 839 F.2d 639, 640 (9th Cir. 1988). As a result, the hearsay rule bars the defendant from introducing his own prior statements. *United States v. Mitchell*, 502 F.3d 931, 964-65 (9th Cir. 2007). If the defendant wants to tell his side of the story, he must take the stand and testify under oath and be subject to cross-examination. And, where a defendant's statement was not written or recorded, the rule of completeness (Fed. R. Evid. 106) does not apply. Thus, for such statements, where the government elicits the inculpatory portion of a defendant's statement from a witness, the defendant is not entitled to elicit the exculpatory portion on cross-examination. *Ortega*, 203 F.3d at 682.

**B.    Statements by Other Individuals in Text Messages Are Not Hearsay**

Some of the evidence in this case will consist of electronic communications between the defendant and other individuals in text/SMS messages (or other similar app-based messaging). The defendant's messages are admissible evidence as they constitute statements of a party-opponent pursuant to Rule 801(d)(2)(A).

The statements of the other speakers in these communications are admissible for a variety of non-hearsay purposes, rather than for the truth of the matters asserted by those speakers. Generally, the statements by other speakers are offered to put the defendant's or co-conspirators' statements in context. *See United States v. Whitman*, 771 F.2d 1348, 1352 (9th Cir. 1985); *United States v. Tolliver*, 454 F.3d 660, 666 (7th Cir. 2007) ("Statements providing context for other admissible statements are not hearsay because they are not offered for their truth"); *United States v. Barone*, 913 F.2d 46, 49 (2d Cir. 1990) (the district court properly admitted evidence of an informant's recorded statements during a conversation with the defendant where they were presented not for the truth of the matter asserted, but to establish a context to assist the jury in understanding the recorded statements of the defendant, i.e., his admissions); *see also United States v. Davis*, 890 F.2d 1373, 1380 (7th Cir. 1989) (when a defendant has an out-of-court recorded conversation with a third party, and the defendant's statements are

GOVERNMENT'S TRIAL BRIEF - 13
*United States v. Henline*, CR22-69 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

admissible as party admissions, the third party's statements to the defendant during the recorded conversation are admissible "as reciprocal and integrated utterances between two parties for the limited purpose of putting the response of the defendant in context of making them intelligible to the jury and recognizable as admissions" (citations omitted)).

Here, the defendant sent a slew of text messages on and around April 6, 2022, in which he demonstrates that his life is unraveling and he is struggling. These messages are relevant evidence demonstrating the defendant's state of mind and location in the period of time surrounding the arson.

## C.    Charts and Summaries

The government may seek to introduce exhibits summarizing information from records produced by Facebook, Google, Verizon, and forensic examinations of cellular phones the defendant used during and following the arson, as well as organizing events into a clear timeline. The government may use some of its charts and summaries during opening statements, the presentation of its case in chief and/or during closing argument. These charts and summaries will substantially assist the jury in understanding the government's proof in this case.

It is well-established that a trial court in its discretion may allow the presentation of summary evidence to guide and assist the jury in understanding and judging the factual controversy. *See* Fed. R. Evid. 1006; *United State v. Skalicky*, 615 F.2d 1117, 1120–21 (5th Cir. 1980); *United States v. Cooper*, 464 F.2d 648, 656 (10th Cir. 1972). A foundation for the admission of each chart and summary will be laid through the testimony of various witnesses, who will testify that the charts and summaries accurately reflect information contained in documents already in or to be admitted into evidence. *See United States v. Lemire*, 720 F.2d 1327, 1349 (D.C. Cir. 1983); *United States v. Pollack*, 417 F.2d 240, 241 (5th Cir. 1969). The court and jury are entitled to have a witness "organize and evaluate evidence which is factually complex and fragmentally

GOVERNMENT'S TRIAL BRIEF - 14
*United States v. Henline*, CR22-69 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

revealed." *United States v. Shirley*, 884 F.2d 1130, 1133-34 (9th Cir. 1989) (agent's testimony regarding her review of various telephone records, rental receipts, and other previously offered testimony held to be proper summary evidence as it helped the jury organize and evaluate evidence; summary charts properly admitted).

Because of the voluminous amount and nature of data evidence in this case, the government intends to rely on the testimony of the law enforcement officers who examined the data to summarize and analyze the contents of the information retrieved from the various accounts. Federal Rule of Evidence 1006 provides that "the contents of voluminous writings, recordings or photographs which cannot be conveniently examined in Court may be presented in the form of a chart, summary, or calculation." *See also United States v. Meyers*, 847 F.2d 1408, 1412 (9th Cir. 1988) (approving the use of a summary chart where the sequence of events was confusing and the chart contributed to the clarity of the presentation).

Although the underlying materials upon which the summary testimony is based must be "admissible," they need not be actually admitted into evidence. *Meyers,* 847 F.2d at 1412. The foundation for admission of such a summary is simply that the records are voluminous and that in-court examination would be inconvenient. *United States v. Duncan*, 919 F.2d 981, 988 (5th Cir. 1990).

Summary charts may also be used by the government in its opening statement. Indeed, "such charts are often employed in complex conspiracy cases to provide the jury with an outline of what the government will attempt to prove." *United States v. De Peri*, 778 F.2d 963, 979 (3d Cir. 1985) (approving government's use of chart), *cert denied*, 475 U.S. 110 (1986); *United States v. Rubino*, 431 F.2d 284, 290 (6th Cir. 1970), *cert. denied* 401 U.S. 910 (1971) (same).

In addition, summary charts are admissible under Federal Rule of Evidence 611(a), which permits a court to "exercise reasonable control over the mode and order of

GOVERNMENT'S TRIAL BRIEF - 15
*United States v. Henline*, CR22-69 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

examining witnesses and presenting evidence so as to (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment."

**D.    Expert Witnesses**

The United States is prepared to call seven expert witnesses pursuant to Federal Rule of Evidence 702 and has provided prior notice to the defense of their identities and the subject matter of their testimony. Specifically, the government plans to call the following witnesses:

Benjamin Rouleau, Electrical/Fire Research Engineer, ATF Fire Research Laboratory will testify to his qualifications, experience, and examinations of the following crime scene areas: utility electrical system, utility company response, utility metering information, electrical examination, and opinions draw therefrom.

Da-il Kim, Forensic Biologist, ATF Forensic Science Laboratory will testify to his qualifications, experience, and examination of lab exhibits 9 (cigarette lighter) and 12 (Rockstar energy drink can) with negative results for the presence of Deoxyribonucleic Acid (DNA). Forensic Biologist Kim will explain the basics of DNA origination, sampling, testing, and the various factors that affect DNA recovery from a fire scene including exposure to high temperatures and chemicals that may degrade DNA, loss of DNA during handling and/or extinguishment of the fire, and no or low deposition of DNA.

Ryan McCormick, Special Agent/Certified Fire Investigator, ATF National Response Team will testify to his qualifications, experience, crime scene response and investigative actions, and corresponding opinions as to the origin of the fire as the lower deck behind 40 Spring Street (Crystal Seas Kayaking) and the cause of the fire as incendiary.

GOVERNMENT'S TRIAL BRIEF - 16
*United States v. Henline*, CR22-69 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Allison Rees, ATF Forensic Science Laboratory Fingerprint Specialist will testify to her qualifications, experience, and her visual and chemical examination of lab exhibits 9 (cigarette lighter) and 12 (Rockstar energy drink can) with negative results for the presence of latent prints. Forensic Specialist Rees will explain the process of examination, relevance of friction ridge skin in identification, transfer scenarios, surface implications, condition implications, and factors impacting retention.

Lisa Schwenk, Forensic Chemist, ATF Forensic Science Laboratory, will testify to her qualifications, experience, and examination of a number of soil and debris samples collected form the arson's origin location with negative results for the presence ignitable liquids.

Forensic Chemist Schwenk also examined lab exhibit 6 (gallon can containing fire debris and soil sample to include a piece of melted and burned plastic) and was unable to determine the original color, shape, or size due to its condition. Forensic Chemist Schwenk examined lab exhibits 10 (vial containing sample of fluid from the Ronsonol Lighter Fuel) and 11 (quart can containing defendant's gloves with bones and metal studs) and concluded that exhibit 10 is an ignitable liquid light petroleum product and exhibit 11 contained toluene, which is an ignitable liquid.

Forensic Chemist Schwenk further examined lab exhibit 12 (Rockstar energy drink containing Styrofoam-like materials and other unidentified liquids/components) and 13 (vial containing sample fluid collected from Rockstar energy drink can) and concluded that exhibit 12 contained three visually distinct types of polystyrene material and a polyurethane-based material and that exhibit 13 contained a heavy normal alkane product, which is an ignitable fluid. Samples from both exhibits 12 and 13 were tested and did not burn.

Rick Wyant, Washington State Patrol Crime Laboratory will testify to his qualifications and his examination of Marinkovich's flat tire and knives recovered from

the defendant's room. He will opine that the sidewall of the tire has a stab-type defect about 1.25" in width. The defect was caused by a single-edged tool. One of the knives recovered from Henline's room is a six-inch long, single-edged, fixed blade knife with a width of about 1.25". That knife could not be excluded as a source of the stab-type defect in the tire.

Brian Grove, Senior Fire Research Engineer, ATF Fire Research Laboratory. It is anticipated that Engineer Grove will testify as a rebuttal witness to his qualifications, experience, investigatory scene participation, examination and interpretation results, and opinions as to cause and origin of the fire as incendiary.

Under Federal Rule of Evidence 702, a witness qualified as an expert based on his or her knowledge, skill, experience, training, or education may testify to his or her opinion provided that it will "help the trier of fact to understand the evidence or to determine a fact in issue," and other foundational requirements are met. The proffered testimony must be both (1) relevant, that is, it must have a valid connection to the pertinent inquiry at trial, and (2) reliable, that is, it must be trustworthy. *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 596-97 (1993). Each of the government's proposed expert witnesses is an expert in his or her respective chosen fields, and the government submits that their testimony will meet the reliability requirements set forth in the Rule.

**E.    Video Recordings**

The government intends to introduce video recordings from April 6, 2022, through April 7, 2022, from various vantage points in downtown Friday Harbor all of which surround the arson scene. These videos have been collected from businesses and agencies that record activities in the normal course of business or for security purposes. The authenticity of recordings is a jury question, once a prima facie case of authorship is made out by the proponent of the evidence. *Carbo v. United States*, 314 F.2d 718, 742-43

(9th Cir. 1963).[3] A prima facie case of authorship may be shown circumstantially. *United States v. Young*, 470 F.2d 962, 964 (9th Cir. 1972).

The government will establish the authenticity, accuracy, and trustworthiness of the recordings through employees and agents who collected and reviewed the recordings. For the most part, the government intends to introduce the entirety of the recordings, but will play only the relevant portions at trial.

## F.    Photographs and Diagrams

The government expects to offer photographs, maps, and diagrams of various locations associated with the case, including the buildings consumed and impacted by this arson. These exhibits are admissible if a witness testifies that they are accurate representations of what they are intended to depict. *United States v. Brannon*, 616 F.2d 413, 416 (9th Cir. 1980) (evidence that photographs accurately depict scene provides a sufficient foundation for admission under FRE 901(a)).

## G.    Exclusion of Witnesses

Pursuant to Rule 615 of the Federal Rules of Evidence, the government respectfully requests that witnesses be excluded from the courtroom, with the exception of ATF Special Agent Heller, who is the case agent. The government is also seeking to have ATF Certified Fire Investigator McCormick and Senior Fire Research Engineer Grove observe the testimony of defense expert Dale Mann. *United States v. Thomas*, 835 F.2d 219, 222-23 (9th Cir. 1987); *see also United States v. Machor*, 879 F.2d 945, 953-54 (1st Cir. 1989).

## V.    RECIPROCAL DISCOVERY

To date, the government has provided over 20,000 pages of discovery to the defense, including documents, law enforcement reports, memoranda, photographs, audio

---

[3] *Cf. United States v. King*, 587 F.2d 956, 961 (9th Cir. 1978) (applying a standard of clear and convincing evidence to sound recordings); *but see United States v. Hock Chee Koo*, 770 F.Supp. 1115, 1121-122, n.4 (rejecting heightened standard of clear and convincing as to computer imaging, and limiting *King* to sound recordings)..

GOVERNMENT'S TRIAL BRIEF - 19
*United States v. Henline*, CR22-69 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

files, video recordings, data from the defendant's phone as well as Facebook and Google accounts, transcripts, and laboratory material. In repeated conversations with counsel for the defendant, the government has invited requests for any discovery that they believe may be missing. And the government has continued to produce discovery regularly as it receives it.

However, other than materials related to the testimony of Dale Mann and David Faigman, the United States has not received any reciprocal discovery from the defense. Accordingly, the government will seek to exclude any evidence offered during the course of trial that should have been provided previously, pursuant to Rule 16(d)(2) of the Federal Rules of Criminal Procedure.

## VI.    STIPULATIONS

In order to shorten the trial and focus on the issues that are in dispute, the government has offered to stipulate to a number of items, including:

• The white BIC lighter and the Rockstar energy drink were tested for fingerprints with negative results, and that the lack of fingerprints does not mean that no one touched it.

• The white BIC lighter and the Rockstar energy drink were tested for DNA with negative results, and that the lack of DNA does not mean that no one touched it.

• The various surveillance videos are authentic and the time stamps on them are accurate or, where not accurate, are off by the amount of time stated by various agents who examined them.

• The chain of custody of debris and soil collected at the scene of the fire is adequate for authentication.

• The tire recovered from Marinkovich has a stab-type defect in the sidewall, which is about 1.25 inches in width. The defect was caused by a stab from a single-edged tool. One of the knives recovered from Henline's room is a six-inch long, single-edged,

GOVERNMENT'S TRIAL BRIEF - 20
*United States v. Henline*, CR22-69 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

2  fixed-blade knife with a width of about 1.25". That knife could not be excluded as a

3  source of the stab-type defect in the tire.

4      To date, the defendant has declined to enter into any stipulations, as is his right.

5  ### VII.   CONCLUSION

6      The government is not aware of other legal issues that are likely to arise during the

7  course of this trial. If other issues do arise, the government will address those issues by

8  way of supplemental briefing.

9

10     DATED this 16th day of October, 2023.

11

12                                    TESSA M. GORMAN
                                      Acting United States Attorney
13

14                                    */s/ Cecelia Gregson*
                                      CECELIA GREGSON
15                                    ERIN H. BECKER
                                      Assistant United States Attorneys
16                                    700 Stewart Street, Suite 5220
                                      Seattle, Washington 98101
17

18

19

20

21

22

23

24

25

26

27

28