The Honorable Brian A. Tsuchida

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DWIGHT CHRISTIANSON HENLINE,<br><br>Defendant. | No. CR22-69 JHC<br><br>**RESPONSE TO DEFENDANT'S MOTION TO REOPEN DETENTION HEARING** |

## I.   INTRODUCTION

After a full hearing, the Honorable Mary Alice Theiler ordered the defendant, Dwight Henline, detained pending trial. Dkt. 8, 11. Henline now moves this Court to reopen that hearing and order him released on conditions. Dkt. 119. He rests his motion on three claims: he has housing and employment; his trial ended in a mistrial, with the jurors unable to reach a unanimous verdict; and he has been detained for 18 months. None of these provides a sufficient basis—alone or in combination—to reopen the detention hearing, let alone to release him. This Court should deny the motion.

## II.   FACTUAL BACKGROUND

### The Fire

On Thursday, April 7, 2022, at approximately 3:43 a.m., Eugene Wilson, a local tow truck driver, called the San Juan County Sheriff's Office (SJCSO) dispatch reporting

Opposition to Motion to Reopen - 1
*United States v. Henline* / CR22-69 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

a fire in downtown Friday Harbor. Firefighters responded quickly and found a large fire engulfing the rear of the building at 40 Spring Street, which housed the businesses Crystal Seas Kayaking, San Juan Excursions, and San Juan Property Management. The firefighters attempted to quell the flames, but they spread to the eaves of the adjacent building, 50 Spring Street (leased by Windermere Real Estate San Juan Island), and then to the next building at 70 Spring Street/80 First Street (leased by Crow's Nest Coffee Shoppe and Herb's Tavern LLC), before the fire was brought under control. Those three buildings were so badly damaged that they were torn down. The fire also damaged other buildings on the block, most notably a building on the other side of 40 Spring Street, 1 Front Street (leased by a number of different businesses, including the SkyBar). Each of those businesses was significantly impacted by the fire.

Because of the scale of the fire and damage, and the small fire department, ATF's National Response Team (NRT), comprising about two dozen certified fire investigators, certified explosive specialists, electrical engineers, fire protection engineers, and other investigators, responded to the island. Over the next week, they processed the scene, interviewed victims and witnesses, and collected evidence to determine the origin and cause of the fire. Among the many items of evidence collected, investigators found a white BIC lighter on the sidewalk in front of 1 Front Street.

During that investigation, agents located and recovered video from a Nest Security System in the Windermere Real Estate Office. One of the cameras inside Windermere was set in a rear conference room, pointing towards the back of the building. The windows in that conference room were adjacent to and looked out at the rear wooden deck area of the Crystal Seas Kayaking building. While the shades to those windows were closed, the video captured a bright flash of light at approximately 10:04 p.m. on April 6, 2022. The flash of light lasted for approximately 34 seconds and then began to flicker and diminish in brightness. The audio also captured a crackling sound.

Opposition to Motion to Reopen - 2
United States v. Henline / CR22-69 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Several hours later, at approximately 3:15 a.m. on April 7, 2022, the Windermere Real Estate Office's Nest Security System began capturing a glow through the windows and the glass door of the conference room. At approximately 3:38 a.m., a glow consistent with fire and what appeared to be white smoke were observed outside the windows and the glass door. The video ended when the power to the building went out a few minutes later.

Based upon witness statements, fire patterns and fire dynamics, the Nest video from Windermere, and other evidence, Certified Fire Investigator Ryan McCormick determined that the fire originated on the lower rear wooden deck behind Crystal Seas Kayaking. He further determined that the cause of the fire was an ignitable liquid being introduced into the fire scene and ignited at about 10:04 p.m. He classified the fire as incendiary, meaning that it was intentionally caused.

<u>Identification of Henline in the Vicinity of the Fire When It Began</u>

During their investigation, ATF Special Agents and SJCSO personnel collected video recordings from numerous cameras in the vicinity of Crystal Seas Kayaking. None of the cameras was pointed at the front of Crystal Seas Kayaking or its back deck, other than the Windermere camera, for which the shades were closed. One of those video recordings showed a person walking away from the vicinity of Crystal Seas Kayaking at 10:05 p.m.—just one minute after the fire was ignited. Investigators pieced together other video to identify that person and trace his movements through Friday Harbor on the evening of April 6, 2022. Through that work, they were able to identify the person as the defendant, Dwight Henline, and establish a timeline of his activities. These included:

5:04 p.m.: Henline purchased candy and two Rockstar energy drinks at King's Market.

5:12 p.m.: Henline purchased bleach and ammonia at King's Market.

7:15 p.m. (approximately): SJCSO Deputy Holt served Henline with a trespass notice at Washington State Ferries Lot C.

Opposition to Motion to Reopen - 3
*United States v. Henline* / CR22-69 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

7:50 p.m.: Henline walked to a large red building on the waterfront, which housed an ice cream shop and other businesses, and went behind and below the building to the lower deck; he appeared to be carrying a backpack and rolling a suitcase.

8:10 p.m.: Henline walked up the stairs from the deck area without the suitcase and traveled towards Cask and Schooner Public House, which is at 1 Front Street and adjacent to Crystal Seas Kayaking. Henline appeared to be carrying a backpack.

8:24 p.m. to 9:37 p.m.: Henline made several trips to and from the lower deck of the red building, walked around downtown, and bought something at Haley's, a sports bar and restaurant.

9:53 p.m.: Henline entered The Little Store, a local convenience store, and purchased Ronsonol lighter fuel.

9:55 p.m.: Henline took a circuitous route to Spring Street.

9:56 p.m.: Henline crossed Spring Street, passed King's Market (a grocery store about a block from and on the same side of Spring Street as Crystal Seas Kayaking), and continued to travel towards the area of Crystal Seas Kayaking.

10:04 p.m.: The fire ignited on the back deck of Crystal Seas Kayaking.

10:05 p.m.: Henline emerged from the block where all four victim buildings were located, eight minutes after he entered the block. He crossed the street, went behind and below the red building where he had stashed his suitcase, retrieved the suitcase, and walked towards the ferry terminal.

Henline remained in the area of the ferry terminal until he boarded the ferry at 10:24 p.m. The boat departed a few moments later.

Henline was identified from the ferry video by San Juan County law enforcement personnel. He was well known to a number of the deputies, as his previous conduct had generated several calls for service in Friday Harbor. In fact, as referenced above, Deputy Holt interacted with Henline at about 7:15 p.m. that evening when he issued him a trespass notice. Deputy Brandt saw Henline at King's Market in the cleaning products

Opposition to Motion to Reopen - 4
United States v. Henline / CR22-69 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

aisle, right before he purchased the bleach and ammonia. And Deputy Holt took a report from Henline's former girlfriend and her new boyfriend that Henline had harassed them earlier that afternoon.

### Vehicle Search Warrant

On April 11, 2022, after identifying Henline as the probable suspect, investigators located Henline's 1999 Mercury Villager minivan parked in the Friday Harbor Washington State Ferries Commuter Parking Lot C. They towed the van and obtained a search warrant. Inside, agents recovered a King's Market receipt dated April 6, 2022, at 17:05:38, documenting a purchase of two energy drinks and M&Ms; multiple lighters, including two white BIC lighters that looked like a white lighter that had been found near the scene of the fire; charcoal lighter fluid; and a gas can with gasoline.

### Phone Interview of Henline

On April 13, 2022, the case agent, Greg Heller, and SJCSO Detective Lukas Peter were trying to locate Henline. They obtained his phone number and a search warrant to track his phone. They also called Henline, and ultimately spoke with him twice. The investigators recorded the calls.

Henline told them that he had left Friday Harbor and was "done with that place." He confirmed that he had had contact with a SJCSO deputy who had served him with a trespass notice. Henline told the investigators that he had left Friday Harbor before the fire started, initially saying he had been trying to take the 7:30 p.m. ferry, before admitting that that ferry left late. He said he had ordered a chicken wrap from Haley's around 9:00 p.m., picked it up, and walked down that side of the street (i.e., the side across the street from Crystal Seas Kayaking) towards the ferry terminal. He said that as he walked by, he saw some people outside of Herb's Tavern. He estimated this was about 9:30 p.m. Henline said he ate his food and had a cigarette near an ice cream shop where he could watch for the ferry to arrive. Henline said he did not walk behind any buildings

Opposition to Motion to Reopen - 5
United States v. Henline / CR22-69 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

or go anywhere else because he was trying to catch the ferry. He denied ever going behind any buildings. He denied buying lighter fluid.

### Search of Henline's Grandparents' Residence; Arrest

The warrant for Henline's phone's location led investigators to the vicinity of Henline's grandparents' house. They obtained a search warrant to search that house, which they executed on April 15, 2022. The grandparents directed agents to a bedroom, where investigators located an 8-ounce yellow Ronsonol lighter fuel container, consistent with the one that Henline purchased from the Little Store right before the fire began, that was mostly empty; several BIC lighters; clothing consistent with what was worn by Henline in the various surveillance videos collected during the investigation; a black suitcase also consistent with what was seen in the surveillance footage; several knives; a Rockstar energy drink can; and documents connecting Henline to the items. Agents seized a black cell phone that they determined was Henline's.

Following the execution of the residence search warrant, investigators obtained a state arrest warrant. A Langley Police Department officer ultimately located and arrested Henline in Langley on April 16, 2022, wearing some items of clothing that were also consistent with what Henline wore as he walked around Friday Harbor on April 6, 2022.

### Lighter Fuel

Investigators purchased Ronsonol lighter fuel from the Little Store for $4.87. They compared the Ronsonol lighter fuel container that they purchased to the Ronsonol lighter fuel container they recovered during the search warrant; the two containers appeared to be identical. In fact, they both had the same identification number on the bottom. Ronsonol has advised that the number represents the precise minute that the bottle came off the production line, and that only about 175 bottles come off per minute.

The Ronsonol lighter fuel bottle indicated that when new it contained 237 mL of product. Investigators measured the contents of the bottle recovered from Henline's room during the search warrant. Approximately 30 mL remained in it.

Opposition to Motion to Reopen - 6
United States v. Henline / CR22-69 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Ronsonol lighter fuel is commonly used to fill refillable lighters. It is marked as being "extremely flammable." During the executions of the search warrant of the residence and Henline's minivan, investigators located many BIC disposable lighters. No refillable lighters were recovered.

## Search of Abandoned Car

On June 14, 2022, a Friday Harbor resident directed SJCSO Deputy Peter[1] to an abandoned car in an empty parking lot a few blocks away from the fire scene. Inside, the deputy noticed a blue bag containing a bottle of lamp oil, a bottle labeled ammonia, and other items that seemed like they could be connected to the fire. Outside the car was a Rockstar Energy drink can filled with Styrofoam and a liquid, probably the lamp oil.

Deputy Peter searched the car pursuant to the registered owner's consent. Inside he found a blue bag containing a bottle of paraffin lamp oil, a container of ammonia, a container of bleach, and more pieces of Styrofoam. The blue bag, ammonia, and bleach were consistent with what Henline had purchased at King's Market on the day of the fire. Agents later located a record from the local ACE Hardware store showing—and the clerk remembered—that Henline had bought the lamp oil that day as well.

## Motive

Henline grew up and his family lived in Oak Harbor on Whidbey Island. However, in 2021 and 2022, he was living in Friday Harbor. In the weeks preceding the fire, Henline's life and mental state were deteriorating. Two former romantic partners—Aurora Covington and Sophie Marinkovich—wanted nothing more to do with him. He became distraught and angry whenever he heard their names. When he ran into Covington and her new boyfriend, Jamie Briggs, on March 27, 2022, he yelled at them, called them names, and repeatedly tapped the knives that he often carried on his person. Covington and Briggs were so alarmed that they called the police. Officers responded,

---

[1] Deputy Peter has since been elected the San Juan County Sheriff.

Opposition to Motion to Reopen - 7
United States v. Henline / CR22-69 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

took a report, and contacted Henline. He told the officers that he was having "one of those days," that he needed his medications changed to be more effective, and that he had "just [seen] [his] ex and lost [his] cool."

He also could not keep a job. He had been working for Made Pressure Washing, Window, Roof, and Gutter Cleaning doing odd jobs, but was fired because he was unreliable.

Henline was on the outs with his roommate, Eric King, who had to move out as a result. Henline invited another person to live with him, but ultimately they could not pay the rent, so his landlord told him to vacate his residence. He did, but his vehicle was inoperable, so he left it behind. The landlord continually asked him to have it towed away.

Things came to a head on April 6, 2022. After calling his former boss, Ade Kurniadi, and asking for his job back, Kurniadi gave him another chance. Only a couple of hours into the work day, Kurniadi told Henline that if his work did not improve, he could not continue to employ him. Minutes later, Henline gave up, told Kurniadi he wanted to go home, and quit. Kurniadi gave him a ride from the worksite into the town of Friday Harbor and dropped him off hear ACE Hardware.

While in Friday Harbor, Henline went to King's Market and bought the bleach and ammonia, as discussed above. He then headed a few blocks down the street towards the lot where the abandoned car, bleach, ammonia, paraffin oil, Styrofoam, and Rockstar Energy can were later found. At some point, he opened the ammonia and bleach, but eventually abandoned them there.

As he left the lot at about 5:44 p.m., he encountered Covington and Briggs again. According to Briggs, Henline yelled at them, saying he would "come after them," that they wouldn't see it coming, and that they wouldn't know what happened. Covington confirmed that Henline was threatening them, calling them "pieces of shit," telling them that they "deserved to die," and saying that he would come after them when they least

Opposition to Motion to Reopen - 8
United States v. Henline / CR22-69 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

expected it. Covington and Briggs again reported the incident, providing written statements.

Henline then proceeded to ACE Hardware, where he purchased the Ultra-Pure Paraffin Lamp Oil at 5:54 p.m. At some point he returned to the abandoned car and empty lot, where he opened the lamp oil, poured some into an empty Rockstar Energy drink can, and added several pieces of polystyrene and related substances, more commonly known as Styrofoam. Budding chemists are aware that Styrofoam can be dissolved in gasoline or a similar fuel to make a sticky, gelatinous, and flammable substance—essentially napalm. However, the Styrofoam did not dissolve in the paraffin lamp oil. Henline abandoned the can and lamp oil next to the abandoned car.

About a half hour later, Henline had contact with an employee of a Friday Harbor church that hosted AA meetings Henline attended. The employee eventually called the police and asked them to trespass Henline from the church. SJCSO Deputy Holt responded, took the complaint, and looked for Henline. Meanwhile, Henline arranged to have the last of his possessions still at his rental home—the inoperable van—towed from that rental to Ferry Lot C. His AA sponsor, Brian Germain, helped him move it. Deputy Holt located Henline at Ferry Lot C as he and Germain arrived with his van. The officer gave Henline the trespass notice. Henline acknowledged receipt, then told Deputy Holt that he was leaving the island the next day and returning to Oak Harbor, where he would live with family. Henline also said that he had left a suitcase at the church. Germain offered to retrieve it.

Over the next few hours, Henline wandered around town as described above. Around 8:30 or 9:00 p.m., Marinkovich drove into the area, parked her car across the street from where the fire later began, and went into Herb's Tavern (one of the businesses later destroyed by the fire) to play pool with a friend. Henline was familiar with her car, as he had previously ridden in it. When Marinkovich left around 10:00 p.m., she discovered that one of the tires on her car was completely flat; it was undriveable. She

Opposition to Motion to Reopen - 9
*United States v. Henline* / CR22-69 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

reparked her car, this time on the other side of the street, closer to where the fire started, and got a ride home. The tire was later collected by investigators, who discovered a slash in it. Rick Wyant, a toolmark examiner, later examined the tire. He determined that it had a slash-type defect caused by a single-edged blade approximately 1.25" in width. Each of the knives recovered from Henline's room is that type of knife.

### III. PROCEDURAL HISTORY

Henline was charged by Complaint with one count of Arson, in violation of Title 18, United States Code, Section 844(i). Dkt. 1. He made his Initial Appearance on May 4, 2022. Dkt. 8. The government moved for detention. Dkt. 10. After a contested hearing, the Honorable Mary Alice Theiler found that Henline posed both a danger of nonappearance and a danger to the safety of the community, and that no conditions or combination of conditions would assure both his appearance and community safety. Dkt. 11. He was detained. *Id*. Henline was later indicted on four counts of Arson arising out of the above-described facts. Dkt. 41.

On October 30, 2023, the matter proceeded to trial before the Honorable John H. Chun. After an 11-day trial, the jury deliberated for more than two full days before determining it was unable to reach a verdict. The Court declared a mistrial on November 16, 2023, and discharged the jury. Dkt. 109.

### IV. ARGUMENT

#### A. Standard.

A detention order may be reopened "at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has *a material bearing* on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f) (emphasis added).

In considering whether pretrial detention or release is appropriate, the Court must determine whether any condition or combination of conditions will reasonably assure the

Opposition to Motion to Reopen - 10  
*United States v. Henline* / CR22-69 JHC

UNITED STATES ATTORNEY  
700 STEWART STREET, SUITE 5220  
SEATTLE, WASHINGTON 98101  
(206) 553-7970

appearance of the defendant as required and the safety of any other person and the community. 18 U.S.C. § 3142(f). The Bail Reform Act provides that a court should detain a defendant pending trial if "no condition or combination of conditions . . . will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f). The United States bears the burden of showing that the defendant poses a danger to the community by clear and convincing evidence, and it bears the burden of showing that a defendant poses a flight risk by a preponderance of the evidence. *United States v. Gebro*, 948 F.2d 1118, 1120 (9th Cir. 1991). The government may present evidence by way of evidentiary proffer sufficient to make the court aware of the defendant's role in the offense, the weight of the evidence against the defendant, and other relevant factors. *See*, *e.g.*, *United States v. Salerno*, 481 U.S. 739, 743 (1987); *United States v. Winsor*, 785 F.2d 755 (9th Cir. 1986).

The Bail Reform Act identifies four factors that a court should consider in analyzing a detention motion: "(1) the nature and circumstances of the offense charged . . .; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including (A) the person's character . . . family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (B) whether, at the time of the current offense or arrest, the person was on probation [or] on parole . . .; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release . . . ." 18 U.S.C. § 3142(g).

**B. Henline Has Not Established a Basis to Reopen His Detention Hearing, Nor Should He Be Released.**

Henline seeks to reopen his detention hearing because he has a different release plan; a jury was unable to reach a verdict in his trial; and "he has been detained since

Opposition to Motion to Reopen - 11
*United States v. Henline* / CR22-69 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

May 04, 2022, and does not have a certain date for a retrial." Dkt. 119, at 2. These do not provide a basis to reopen the detention hearing or to release him.

### 1. Change in Release Plan

Henline first urges this Court to release him because of a change in his release plan. Specifically, Henline proposes to live at his mother's house and work for a friend, Matthew Shea.

First, this is not new information that "was not known to the movant at the time of the hearing." With respect to the housing, although it was not proposed to the Court at the original detention hearing, it is not truly new. Henline stayed at his mother's home the night of the fire, after she picked him up from the ferry. Text messages between them reflect that Henline continued to stay at his mother's for a short time. While Henline's mother's husband was ill, there appears to have been room for him at her home. He left her residence not due to space considerations, but because he wanted to stay with his grandparents, closer to his friends and job.

Similarly, the employment opportunity he suggests is also not new. Henline was working that same job in the days immediately preceding his arrest. There is no reason to believe that he could not have continued to work there or that Shea's willingness to continue to employment him is in any way "new."

Second, this change in release plan in no way ameliorates the concerns for safety of the community that Magistrate Judge Theiler explicitly articulated at the time of the original detention hearing.[2] As the government observed at that hearing, at the time of the fire, Henline had one conviction for domestic violence assault and a pattern of stalking and harassing his former girlfriends. As shown through testimony at trial, this pattern included two occasions immediately prior to the arson in which Henline confronted one former girlfriend and her new boyfriend, threatening them both explicitly and by tapping

---

[2] A copy of the recording from this hearing is attached as Exhibit A.

Opposition to Motion to Reopen - 12
United States v. Henline / CR22-69 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

the ever-present knives that he carried on his person. It also included Henline slashing the tire of a different ex-girlfriend in the hour or two before he set the fire.

In addition to this threatening behavior, Henline had been convicted of driving under the influence about nine months before the fire in an incident that involved him failing to negotiate a turn, then driving through a fence and a yard before running into a home. At the time of that arrest, he had a firearm on his person, despite being a prohibited person.[3] And, he had a history of convictions for resisting arrest and obstructing. Magistrate Judge Theiler concluded that these incidents, coupled with the serious nature of the crime charged, supported her finding—which had to be made by clear and convincing evidence—that Henline posed a danger to community safety that could not be adequately ameliorated through any combination of conditions. Magistrate Judge Theiler also observed in her written order that Henline's history of failures to appear and bench warrants, his earlier noncompliance with supervision, and his substance abuse and mental health history—none of which has changed a whit since his incarceration—also showed that he posed a serious risk of nonappearance. Dkt. 11, at 2.

Other facts, unknown to Magistrate Judge Theiler at the time of the hearing, provide further support to these conclusions. In the hours before the arson, Henline purchased bleach and ammonia, and opened both, before abandoning them in a vacant lot. He also bought lamp fuel and combined it with Styrofoam in an apparent effort to create a sticky, flammable substance. Both of these acts reflect an intent to do harm to the community. Further, Henline had ammunition and a holster in his van, again despite being a prohibited person. And he fantasized about seriously assaulting his previous roommate, against whom he bore a considerable grudge. Ex. B.

---

[3] After the DUI case was adjudicated, the San Juan County Prosecuting Attorney's Office charged Henline with Unlawful Possession of a Firearm. He has made an Initial Appearance on that case, but was released on his own recognizance after San Juan County ceded jurisdiction on the Arson to the United States. The government understands that matter is still pending and will be resolved after the federal case has concluded.

Opposition to Motion to Reopen - 13
United States v. Henline / CR22-69 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Moreover, since his arrest, Henline has continued to demonstrate his dangerousness by talking about wanting to assault and harm others during his phone calls with his mother—the person with whom he now proposes to reside. *See*, *e.g.*, Ex. C, at 5:05–9:15 (July 8, 2023: Henline threatening his brother for criticizing him); Ex. D, at 7:40–11:10 (August 17, 2023: Henline threatening his daughter's boyfriend).

Changing his release plan from his grandparents' home to his mother's in no way addresses any of these concerns. Continued detention is needed in order to protect community safety.

    2.    <u>Mistrial</u>

Henline next points to the fact that the jury was unable to reach a verdict as a basis to release him. It is not.

The Bail Reform Act does not define "the weight of the evidence," but under any standard, it is clear that the weight of the evidence in this case is strong, as described above. Two jurors were convinced beyond a reasonable doubt that Henline was guilty. While a number of jurors expressed a variety of doubts, not one of them thought that Henline was innocent. Moreover, there has been no significant change in the evidence since this Court first addressed detention in May 2022. To the extent that the Court views a hung jury—even one split in favor of acquittal—as a change in the weight of the evidence, this is of minimal significance. The weight of the evidence is the least important factor for the court to consider. *Winsor*, 785 F.2d at 757. While weak evidence is more relevant than strong evidence, the evidence here is far from weak, and certainly does not weigh significantly in favor of release given Henline's prior history of failures to appear, the serious nature of the crime, Henline's other concerning conduct, and ongoing mental health and historical substance abuse issues.

    3.    <u>Uncertain Trial Date</u>

Finally, Henline points to the uncertainty of the next trial date as a basis to release him. But Henline's trial date is far from uncertain. Pursuant to the Speedy Trial Act,

Opposition to Motion to Reopen - 14
*United States v. Henline* / CR22-69 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Henline must be brought to trial within 70 days of the mistrial, absent an exclusion of time for one of the statutory reasons. 18 U.S.C. § 3161(e). Here, the mistrial was declared on November 16, 2023. Dkt. 109. Accordingly, Henline must be brought to trial no later than January 25, 2024. The government will be prepared to proceed to trial within that time frame. While Henline suggests that scheduling a retrial will be challenging and time consuming because of the number of witnesses, nearly all of whom were not local, he only has to produce one witness, who lives nearby. The burden of getting the remaining witnesses here lies solely on the government, and it is prepared to meet that burden within the period allotted by statute.

Furthermore, the delay in bringing Henline to trial thus far has been attributable solely to the defense, which has brought three (unopposed) motions to continue the trial date in order to prepare. Dkt. 18, 24, 32. Presumably no additional continuances for the purpose of preparation will be needed.

///

///

Opposition to Motion to Reopen - 15
*United States v. Henline* / CR22-69 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## IV.  CONCLUSION

Henline continues to pose a risk to community safety and a risk of non-appearance. A change of proposed release address does nothing to ameliorate those concerns. This Court should deny the motion to reopen the detention hearing, and maintain Magistrate Judge Theiler's original decision to detain the defendant pending trial.

DATED this 29th day of November, 2023.

Respectfully submitted,

TESSA M. GORMAN
Acting United States Attorney

*/s/ Erin H. Becker*
Erin H. Becker
Cecelia Gregson
Assistant United States Attorney
700 Stewart Street, Suite 5220
Seattle, WA 98101-1271
Telephone: (206) 553-2905
E-mail: Erin.Becker@usdoj.gov

I certify that this memorandum contains 4772 words, in compliance with the Local Criminal Rules.

Opposition to Motion to Reopen - 16
*United States v. Henline* / CR22-69 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970